RECEIPT # 72970
AMOUNT $ 350
SUMMONS ISSUED Y-LJ
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 6-7-06

SCANNED
DATE: 6/6/06
BY:

FILED
IN CLERKS OFFICE

2006 JUN -7 P 3: 39

U.S. DISTRICT COURT
DISTRICT OF MASS.

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT SYSTEM,
Derivatively on Behalf of BROOKS
AUTOMATION INC.,

Plaintiff,

vs.

ROBERT J. THERRIEN, ROGER D.
EMERICK, AMIN J. KHOURY, A.
CLINTON ALLEN, EDWARD C. GRADY,
ROBERT J. LEPOFSKY, JOSEPH R.
MARTIN, JOHN H. MCGILLICUDDY,
KRISHNA G. PALEPU, ALFRED
WOOLLACOTT, III, MARK S. WRIGHTON,
and MARVIN G. SCHORR,

Defendants.

– and –

BROOKS AUTOMATION INC., a Delaware
corporation,

Nominal
Defendant.

No.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND
STATE LAW CLAIMS FOR BREACH OF
FIDUCIARY DUTY, ABUSE OF
CONTROL, CONSTRUCTIVE FRAUD,
CORPORATE WASTE, UNJUST
ENRICHMENT, GROSS
MISMANAGEMENT, BREACH OF
CONTRACT AND ACTION FOR
ACCOUNTING

DEMAND FOR JURY TRIAL

06 - 11000 RWZ

MAGISTRATE JUDGE LTS



## SUMMARY AND OVERVIEW OF THE ACTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant Brooks
Automation Inc. ("Brooks" or the "Company") against its current Board of Directors and certain
former top officers and directors for violations of federal and state law, including breaches of
fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross
mismanagement arising out of a scheme and wrongful course of conduct whereby Defendants
allowed the backdating of stock option grants to and for the benefit of Brooks' directors and top
executive officers, including the Company's former Chairman and Chief Executive Officer ("CEO")
Robert J. Therrien ("Therrien"), and Amin J. Khoury ("Khoury") and Roger D. Emerick
("Emerick"), former directors and members of its Compensation Committee, and/or failed to
properly investigate whether these grants had been improperly made. Each of the Defendants also
participated in the concealment of the backdating option scheme complained of herein and/or refused
to take advantage of the Company's legal rights to require these insiders to disgorge the illicitly
obtained incentive compensation and proceeds diverted to them since 1998. Each of the Defendants
either knew of the backdating and were participants in the fraudulent and unlawful conduct or should
have known of this conduct and done more about it.

2.      Stock option grants give recipients a right to buy company stock at a set price, called
the exercise price or strike price. The right usually does not vest for a year or more, but then it
continues for several years. The exercise price is usually the stock's closing price on the date of
grant. Obviously, the lower the exercise price, the more money the recipient can potentially make
some day by exercising the options.

3.      On March 18, 2006, in an article entitled *The Perfect Payday: Some CEOs Reap
Millions By Landing Stock Options When They Are Most Valuable; Luck – Or Something Else?, The
Wall Street Journal* published an analysis of stock options granted to select chief executive officers

- 1 -

and directors of several companies, including Brooks. With regard to Brooks, *The Wall Street*

*Journal* stated, in pertinent part, as follows:

> Before the stricter rules, Brooks Automation Inc., a semiconductor-equipment maker in Chelmsford, Mass., gave 233,000 options to its CEO, Robert Therrien, in 2000. The stated grant date was May 31. That was a great day to have options priced. Brooks' stock plunged over 20% that day, to $39.75. And the very next day it surged more than 30%.
>
> A June 7 Brooks report to the SEC covering Mr. Therrien's May options activity made no mention of his having gotten a grant on May 31, even though the report -- which Mr. Therrien signed -- did cite other options-related actions he took on May 31. Not until August was the May 31 grant reported to the SEC.
>
> It wasn't the only well-timed option grant he got. One in October 2001 came at Brooks stock's lowest closing price that year, once again at the nadir of a sharp plunge. ***The Journal analysis puts the odds of such a consistent pattern occurring by chance at about 1 in nine million.***
>
> Mr. Therrien, who stepped down as CEO in 2004 and retired as chairman this month, didn't return messages seeking comment. Chief Financial Officer Robert Woodbury said Brooks is "in the process of revamping" practices so grants come at about the same time each year. Mr. Woodbury, who joined in 2003, said no one at Brooks would be able to explain the timing of Mr. Therrien's grants.
>
> The highly favorable 2000 grant also benefited two others at Brooks -- the compensation-committee members who oversaw the CEO's grants. Although Brooks directors typically got options only in July, that year a special grant was awarded just to these two directors, Roger Emerick and Amin J. Khoury. Each got 20,000 options at the low $39.75 price. By the time of their regular July option-grant date, the stock was way up to $61.75, a price far less favorable to options recipients. [Emphasis added.]

4.     Backdating the date of issuance of Defendants Therrien, Emerick and Khoury's stock

option grants not only violated Brooks' publicly disclosed stock option plans, which provided that

"no compensation expense was recognized as long as the exercise price equaled or exceeded the

market price of the underlying stock on the date of the grant," but it also was in breach of

Defendants' fiduciary duties of good faith, fair dealing and loyalty to Brooks.

5.     Defendants' conduct has unjustly enriched Brooks' top executives, including

Defendants Therrien, Emerick and Khoury, to the detriment of Brooks and its public shareholders.

A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating them so they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start. For example, if a company grants options on May 22, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a "sure thing."

6.    Due to Defendants' conduct, Brooks has been exposed to a costly investigation by the United States Securities and Exchange Commission ("SEC"), as well as to potential costly and expensive lawsuits for violations of the federal securities laws and accounting rules applicable to public companies. As *The Wall Street Journal* explained:

> Companies have a right to give executives lavish compensation if they choose to, but they can't mislead the shareholders about it. Granting an option at a price below the current market value, while not illegal in itself, could result in false disclosure. That's because companies grant their options under a shareholder-approved "option plan" on file with the SEC. The plans typically say options will carry the stock price of the day the company awards them or the day before. If it turns out they carry some other price, the company could be in violation of its options plan, and potentially vulnerable to an allegation of securities fraud.
>
> It could even face accounting issues. Options priced below the stock's fair value when they're awarded bring the recipient an instant paper gain. Under accounting rules, that's equivalent to extra pay and thus is a cost to the company. A company that failed to include such cots in its books may have overstated its profits, and might need to restate past financial results.

7.    Professor Stephen Bainbridge, Professor of Corporate Law at UCLA, agrees:

> There's nothing inherently illegal about either paying large compensation or even backdating an option contract, so long as proper corporate procedures were followed and the grant does not amount to a waste of corporate assets. Where public corporations are concerned, however, failure to disclose the backdating likely would constitute securities fraud. In particular, failure to do so probably would constitute a material omission with respect to the executive compensation disclosures required in the proxy statement for the corporation's annual meeting.

> Stephen Bainbridge, *Option Grant Timing*, March 18, 2006,
> http:www.professorbainbridge.com/2006/03/index.html.

8. Moreover, as a result of Defendants' conduct, the Company's proxy materials that have been filed with the SEC are false and misleading, the Company may be liable for illegal insider trading, the Company may be in violation of certain provisions of the Internal Revenue Code since it may not be able to deduct the options payments from its taxable income and the Company has admitted a need to restate its financial results for prior periods since it should have accounted for the options as a compensation expense which would reduce the Company's net income in periods prior to fiscal 2006.

9. By this action, plaintiff seeks to recover damages and other relief against Defendants for the severe injuries their misconduct has inflicted upon Brooks.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under Massachusetts law for violations of breach of fiduciary duty, abuse of control, constructive fraud, waste of corporate assets, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

11. This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

12. Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Brooks is located in and conducts its business in this District.

- 4 -

## THE PARTIES

13. Plaintiff City of Pontiac General Employees' Retirement System is a current shareholder of Brooks.

14. Nominal Defendant Brooks is a Delaware corporation with its executive offices and principal place of business located in Chelmsford, MA.

15. Defendant Therrien was a director of the Company from 1989 to 2006. He was Chairman of the Board from February 2004 until 2006. He also served as President of the Company from 1989 until February 2003, and as CEO from 1989 to September 30, 2004. As Chairman of the Board of Directors, he caused or permitted the backdated stock options described herein to be granted. Defendant Therrien also personally benefited from the backdated stock options, as described herein. Moreover, because of Defendant Therrien's position, he was aware of non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Therrien participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

16. Defendant Emerick was a director of Brooks until his resignation on May 18, 2006. At all relevant times, Defendant Emerick was a member of the Company's Compensation Committee. As a member of the Board of Directors and the Compensation Committee, he caused or permitted the backdated stock options described herein to be granted. Defendant Emerick also personally benefited from the backdated stock options, as described herein. Moreover, because of Emerick's position, he knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance

- 5 -

at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Emerick participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

17.     Defendant Khoury was a director of Brooks until his resignation on May 18, 2006. At all relevant times, Defendant Khoury was a member of the Company's Compensation Committee. As a member of the Board of Directors and the Compensation Committee, he caused or permitted the backdated stock options described herein to be granted. Defendant Khoury also personally benefited from the backdated stock options, as described herein. Moreover, because of Khoury's position, he knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Khoury participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

18.     Defendant A. Clinton Allen ("Allen") has been a Director of Brooks since October 2003. Defendant Allen is a member of the Company's Compensation Committee. As a member of the Board of Directors and the Compensation Committee, Defendant Allen knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant

- 6 -

period, Allen participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

19.     Defendant Edward C. Grady ("Grady") has been President of Brooks since February 2003, a director of Brooks since September 2003 and CEO of Brooks since October 1, 2004. Because of Grady's position, he knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Grady participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

20.     Defendant Robert J. Lepofsky ("Lepofsky") has been a Director of Brooks since October 2005. As a member of the Board of Directors, Defendant Lepofsky knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Lepofsky participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

21.     Defendant Joseph R. Martin ("Martin") has been a Director of Brooks since June 2001. As a member of the Board of Directors, Defendant Martin caused or permitted the backdated stock options described herein to be granted. Moreover, because of Martin's position, he knew non-public information about the business of Brooks, as well as its finances, markets and present and

- 7 -

future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Martin participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

22.     Defendant John H. McGillicuddy ("McGillicuddy") has been a Director of Brooks since October 2003. As a member of the Board of Directors, Defendant McGillicuddy knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, McGillicuddy participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

23.     Defendant Krishna G. Palepu ("Palepu") has been a Director of Brooks since November 2005. As a member of the Board of Directors, Defendant Palepu knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Palepu participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

24.     Defendant Alfred Woollacott, III ("Woollacott") has been a Director of Brooks since October 2005. As a member of the Board of Directors, Defendant Woollacott knew non-public

- 8 -

information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Woollacott participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

25.     Defendant Mark S. Wrighton ("Wrighton") has been a Director of Brooks since October 2005. Defendant Wrighton is a member of the Company's Compensation Committee. As a member of the Board of Directors and of the Compensation Committee, Defendant Wrighton knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Wrighton participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

26.     Defendant Marvin G. Schorr ("Schorr") has been a Director of Brooks since October 2005. As a member of the Board of Directors, Defendant Schorr knew non-public information about the business of Brooks, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Schorr participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

- 9 -

## Duties of Brooks' Officers and Directors

27.     By reason of their positions as Brooks' directors and officers, and because of their
ability to control the Company's business and affairs, Defendants owed and owe Brooks fiduciary
duties of good faith, fair dealing and loyalty, and were and are required to use their utmost ability to
control and manage Brooks in a fair, just, honest, and equitable manner. Defendants were and are
required to act in furtherance of the best interests of Brooks so as to benefit all shareholders equally
and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owes to Brooks the fiduciary duty to
exercise good faith and diligence in the administration of the affairs of the Company and in the use
and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as
directors and/or officers of a public company, Defendants had a duty to promptly disseminate
accurate and truthful information with regard to the Company's financial performance and financial
results so that the market price of the Company's stock would be based on truthful and accurate
information. Defendants, because of their positions of control and authority as directors and/or
officers of Brooks, were able to and did, directly and/or indirectly, exercise control over the
wrongful acts complained of herein, as well as the contents of the various public statements issued
by the Company. Because of their senior positions with Brooks, Defendants, and each of them, had
access to adverse nonpublic information about the unlawful stock option backdating practices and
procedures described herein.

29.     At all relevant times, Defendants, and each of them, were agents of the other
Defendants and of Brooks, and were at all times acting within the course and scope of such agency.

30.     To discharge their duties, Brooks' directors and officers were required to exercise
reasonable and prudent supervision over the management, policies, practices and controls of the

- 10 -

Company. By virtue of such duties, the officers and directors of Brooks were required to, among other things:

      (a)    prevent Brooks' top executives from being granted backdated stock options;

      (b)    prevent Brooks' Compensation Committee from granting backdated stock options;

      (c)    refrain from acting upon material inside corporate information to benefit themselves;

      (d)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      (e)    prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

      (f)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (g)    remain informed as to how Brooks conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the applicable federal and state corporation and/or securities laws; and

- 11 -

(h)     ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

### Aiding and Abetting and Concerted Action

31.     In committing the wrongful acts particularized herein, Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

32.     At all relevant times, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was over-paying its directors, officers and employees via backdated stock option grants; (ii) maintain Defendants' directorial and executive positions at Brooks and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Brooks, regarding Defendants' management of Brooks' operations, the Company's financial health and stability, and future business prospects, which had been misrepresented by Defendants throughout the relevant period. In furtherance of this course of conduct, Defendants collectively and individually took the actions set forth herein.

33.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist in the commission of the wrongdoing detailed herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

- 12 -

## SUBSTANTIVE ALLEGATIONS

34.     Brooks supplies automation products and solutions to the semiconductor market. The

Company offers hardware, software, and services to chip manufacturers and original equipment

manufacturers of semiconductor devices manufacturing equipment.

35.     Since at least 1997, Brooks, through the actions of its Board of Directors and its

Compensation Committee, has granted stock options for the purchase of millions of shares of the

Company's common stock to its top executives, including to many of its current or former directors

and senior officers named as Defendants herein.

36.     In its public filings with the SEC, including in its shareholder-approved stock option

plans, Brooks represented that "[t]he exercise price of an option cannot be less than the fair market

value of the Company's Common Stock at the time of grant."

37.     Furthermore, according to its SEC filings, the exercise price is:

determined by the Committee but may not be less than the greater of (i) the minimum
legal consideration required under the laws of the jurisdiction in which the Company
is then organized or (ii) the Fair Market Value of the Stock on the date of grant of the
Option.

38.     For example, under the Company's 2000 Equity Incentive Plan, formerly known as

the 2000 Combination Stock Option Plan, "fair market value" means:

(i) the closing sales price, if any, on a national securities exchange or automated
quotation system on the date as of which Fair Market Value is being determined or, if
none, shall be the closing sales price on the nearest trading date before that date; and
(ii) if the Common Stock is then traded on an exchange or system which does not
have sale price reporting, the mean between the average of the "Bid" and the average
of the "Ask" prices, if any, as reported for the date as of which Fair Market Value is
being determined. Fair Market Value shall be determined in a manner consistent
with the requirements under Section 409A of the Code.

39.     Contrary to the foregoing public disclosures, the options granted under these plans

were highly favorable to the option recipients because the stock options were not granted at the "fair

market value" on the date of grant but were in fact backdated. In many instances, the grant dates

- 13 -

were allegedly dated just before a sharp increase in the trading price of Brooks stock or at the bottom of a steep drop in the stock's price.

40.     The practice of backdating options at Brooks, and many other companies, commenced prior to the passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes"), when options grants did not have to be reported to the SEC until 45 days after the close of the fiscal year in which the options were granted. Sarbanes amended a section of the Exchange Act and required insiders to file notification of grants within two business days of their receipt.

41.     Defendants took advantage of the pre-Sarbanes rules to perpetrate their scheme. Prior to Sarbanes, Brooks' Board of Directors was comprised of four individuals, including Defendants Therrien, Emerick and Khoury. Moreover, the Company's Compensation Committee consisted of *only* Defendants Emerick and Khoury. Taking advantage of their positions as high-executives and members of the Company's compensation committee, Defendants Therrien, Emerick and Khoury backdated options at prices below fair market value. In fact, Defendant Therrien received six grants between fiscal 1997 and fiscal 2001 at lows in the Company's stock chart. For example:

     (a)     Brooks made one stock option grant to Defendant Therrien in 1999, a grant of 115,000 options purportedly on January 4, 1999. On January 4, 1999, Brooks' stock closed at $14.62, near the bottom of a sharp drop in the price of Brooks common stock, and preceding a sharp price increase. Brooks stock traded in a range from a low of $8.25 to a high of $31.00 during 1999;

- 14 -



**Brooks Automation**

**December 4, 1998 - February 4, 1999**

(b)    Brooks made one stock option grant to Defendant Therrien in 2000, a grant of

233,000 options purportedly on May 31, 2000. On May 31, 2000, Brooks' stock closed at $39.75, at

the bottom of a sharp dip in the price of Brooks common stock, and preceding a sharp price increase.

Brooks stock traded in a range from a low of $16.69 to a high of $91.88 in 2000;[1]

---

[1]    According to *The Wall Street Journal*, a Brooks SEC filing covering Defendant Therrien's
May options activity made no mention of his having received a grant on May 31, 2000 even though
the report, which was signed by defendant Therrien, did cite other options-related actions he took on
May 31, 2000. The May 31, 2000 grant was not reported to the SEC until August 2000.

- 15 -



**Brooks Automation**
April 30, 2000 - July 2, 2000

(c)     Brooks made one stock option grant to Defendant Therrien in 2002, a grant of 90,850 options purportedly on October 1, 2001.  On October 1, 2001, Brooks' stock closed at $25.22, at the bottom of a sharp dip in the price of Brooks common stock, and preceding a sharp price increase.  Brooks' stock traded in a range from a low of $20.25 to a high of $62.61 during 2001; and



**Brooks Automation**

**August 31, 2001 - November 1, 2001**

    (d)        On May 31, 2000, Brooks made a special stock option grant of 20,000 options each to Defendants Emerick and Khoury.[2] On May 31, 2000, Brooks' stock closed at $39.75, at the bottom of a sharp drop in the price of Brooks common stock, and preceding a sharp price increase. Brooks' stock traded in a range from a low of $16.69 to a high of 91.88 during 2000.

    42.       According to *The Wall Street Journal*, the probability of the options granted to Defendant Therrien from 1998 to 2002 occurring by chance on the dates when the prices of Brooks stock was so low, and hence so favorable to Therrien, would be *1 in 9,000,000.*.

---

[2]      Prior to these grants, pursuant to the Company's 1993 Non–employee Director Stock Option Plan, "each non-employee director was granted options to purchase 10,000 shares of [Brooks stock] on the date he is first elected a director and options to purchase 5,000 shares of [Brooks stock] on July 1 of each year thereafter." However, for some unknown reason, Defendants Emerick and Khoury each received an additional option to purchase 20,000 shares of Brooks stock at $39.75 per share.

43.     As a result of the backdating of stock options issued to Defendant Therrien and Brooks' other top insiders, Defendants have been unjustly enriched at the expense of Brooks, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated. These windfall profits have made Defendant Therrien, as well as the other Defendants, some of the highest paid executives in the semiconductor automation and integrated subsystems industry.

44.     Moreover, throughout the relevant period Defendants Emerick, Grady, Khoury and Therrien exercised many of these stock options permitting them to sell over $39 million worth of Brooks stock they obtained. The details of their stock sales are set forth in the chart below:

| DEFENDANT | DATE | PRICE | SHARES | PROCEEDS |
|---|---|---|---|---|
| ROGER EMERICK | 9/5/2003 | $27.21 | 4,000 | $108,840 |
|  | 6/4/2004 | $18.79 | 2,000 | $37,580 |
|  | 4/10/2006 | $13.62 | 5,000 | $68,100 |
| **Total:** |  |  | **11,000** | **$214,520** |
|  |  |  |  |  |
| EDWARD GRADY | 10/3/2005 | $13.62 | 25,000 | $340,450 |
| **Total:** |  |  | **25,000** | **$340,450** |
|  |  |  |  |  |
| AMIN KHOURY | 8/6/1997 | $29.00 | 4,000 | $116,000 |
|  | 2/1/1999 | $22.75 | 1,500 | $34,125 |
|  | 2/1/1999 | $22.81 | 500 | $11,406 |
|  | 2/1/1999 | $22.81 | 2,000 | $45,625 |
|  | 3/1/2000 | $70.25 | 6,500 | $456,625 |
|  | 3/1/2000 | $70.50 | 900 | $63,450 |
|  | 3/1/2000 | $70.63 | 100 | $7,063 |
|  | 3/1/2000 | $70.75 | 100 | $7,075 |
|  | 3/1/2000 | $70.88 | 100 | $7,088 |
|  | 3/1/2000 | $71.00 | 500 | $35,500 |
|  | 3/1/2000 | $71.06 | 200 | $14,213 |
|  | 3/1/2000 | $71.25 | 1,100 | $78,375 |
|  | 3/1/2000 | $75.38 | 500 | $37,688 |
|  | 5/1/2001 | $60.19 | 5,000 | $300,925 |
| **Total:** |  |  | **23,000** | **$1,215,156** |
|  |  |  |  |  |
| ROBERT THERRIEN | 9/18/1997 | $37.25 | 350,000 | $13,037,500 |
|  | 3/13/2000 | $72.01 | 225,000 | $16,202,250 |
|  | 3/23/2000 | $72.01 | 45,000 | $3,240,450 |
|  | 5/1/2001 | $57.23 | 5,000 | $286,125 |
|  | 5/1/2001 | $57.31 | 5,000 | $286,540 |
|  | 5/1/2001 | $57.43 | 5,000 | $287,155 |
|  | 5/1/2001 | $57.85 | 5,000 | $289,225 |

| | | | | |
|---|---|---|---|---|
| | 12/1/2004 | $16.00 | 41,118 | $657,888 |
| | 12/2/2004 | $16.00 | 15,100 | $241,600 |
| | 12/2/2004 | $16.01 | 59,600 | $953,922 |
| | 12/2/2004 | $16.02 | 100 | $1,602 |
| | 12/2/2004 | $16.03 | 34,082 | $546,334 |
| | 2/8/2005 | $17.31 | 5,000 | $86,562 |
| | 2/8/2005 | $17.40 | 5,000 | $86,980 |
| | 2/8/2005 | $17.42 | 5,700 | $99,321 |
| | 2/8/2005 | $17.42 | 8,300 | $144,579 |
| | 2/8/2005 | $17.42 | 10,000 | $174,178 |
| | 2/8/2005 | $17.47 | 20,805 | $363,463 |
| | 2/8/2005 | $17.47 | 6,000 | $104,797 |
| | 2/8/2005 | $17.48 | 2,500 | $43,700 |
| | 2/8/2005 | $17.50 | 2,500 | $43,750 |
| | 2/8/2005 | $17.51 | 10,000 | $175,104 |
| Total: | | | 865,805 | $37,353,026 |
| | | | | |
| Grand Total: | | | 924,805 | $39,123,152 |

45.     The practice of backdating stock options not only lines the pockets of Brooks' directors and executives at the direct expense of the Company, which dollar for dollar receives money when the options are exercised, but also may have resulted in the overstatement of Brooks' financial results in periods prior to fiscal 2006. This is because options priced below the stock's fair market value when they are awarded bring the recipient an instant paper gain. Under accounting rules, that is the equivalent of additional compensation and thus must be treated as a cost to the Company. Brooks did not account as an expense the amount by which the market price of the Company's stock on the actual date the options were issued exceeded the exercise price of the options and thus the Defendants' conduct described herein may have caused Brooks to materially overstate its publicly reported financial results.

46.     Defendants, who were and/or are directors and/or officers of Brooks, with a fiduciary duty to act with the utmost good faith and loyalty, either expressly authorized the practice of backdating stock options or, in conscious disregard of their fiduciary duties, made no effort to seek recompense to the Company.   Moreover, Defendants Emerick and Khoury served on the

- 19 -